Curia, per

Earle, J.
The second ground taken, in arrest of judgment, presents the only question we shall consider; that is, whether the act proved against the defendant was indictable under the A. A. 1789, (P. L. 486; 5 Stat. So. Ca. 139.)
By the third section of that Act, a person convicted of wilfully and knowingly marking, branding, or disfiguring any horse, mare, &c. is subjected to a penalty of ¿£20, and, on non-payment, to be publicly whipped. In construing the Act, it is advisable to refer to its title and to its other provisions, as also to the former laws upon the same subject. The title is, “An Act to prevent the stealing of horses, asses and mules; and for the more effectual prevention of stealing black or neat cattle, sheep, goats, or hogs ; and for the punishment of those who shall unlawfully mark, brand, or kill the same.” The second section provides a punishment for cattle stealing, and the third follows, in immediate connection, imposing the same punishment for marking, branding, or disfiguring either horses or cattle, and a severer penalty in money than is prescribed for stealing sheep, goats, or hogs. The main purpose of the Act was, clearly, to provide adequate punishment for certain offences, which were larcenies at common law, but which had been otherwise punished by former Acts. It is material to observe, that the word “ disfiguring ” is not used in the title of the Act; but the words are, “ mark. *159 Brand, or killand the same punishment is prescribed for those who mark, brand, or disfigure either cattle, sheep, goats or hogs, as for those who steal them. The first clause of the sixth section, which relates to these smaller animals, has the Words “marking, branding, or disfiguring,” and the clause which provides for the second offence, has the words “ killed, branded, or disfigured ” in the same connection. The sixth section forbids a slave to brand or mark any of the domestic animals, except in the presence of a white person and by his direction. If we consider the habit of the country in regard to these animals — that they have always been permitted to roam at large in the fields and forests, the right of property guarded only by such marks and brands as would identify them, and denote the owner — and then view, in connection, the provisions of the Act, we shall have a sufficient clue to the intentions of the Legislature. These animals were particularly exposed to the depredations of the idle and dishonest ranger of the woods, who might, with great facility, either kill for immediate use, such as were suitable, or endanger the owner’s right of property, by “marking, branding, or disfiguring;” — by marking and branding such as were unmarked and without brand ; or by disfiguring such as were marked and branded, either by obliterating former marks and brands, or otherwise disguising the appearance and figure in such a way as to prevent the identity from being ascertained. Such was the nature of the offence which the Legislature intended to provide for and punish. Such had been the purport of former Acts on the subject. The first Act was passed in 1743, and was entitled “ An Act to prevent stealing of horses and neat cattle, and for the more effectual discovery and punishment of such persons as shall unlawfully brand, mark or kill the same;” and the preamble recites the “ great evils of stealing horses and neat cattle, and of unlawfully marking, branding, or killing the same.” In 1762 and 1768, an Act was passed, with the same title and similar provisions, which *160 Was again revived in 1784, all of them having been limited in' their duration. In the Acts of 1762 and 1768, the preamble is the same, and recites “the stealing of horses, and the stealing and unlawfully branding, marking and killing of neat cattle.” Yet, in none of them is there any provision against stealing neat cattle, eo nomine : the offence is made to consist in “wilfully killing, marking, branding, or disfiguring any horse, mare, &c. or neat cattle, the property of any other' person.”
From this reference to former enactments, we think it clear enough that the Legislature looked to the preservation of the right of property, against thieves, or open trespassers, by guarding those brands and marks which were usually adopted, from being obliterated or disguised, and preventing the animal from being otherwise disfigured so as to mislead the owner.
The act charged against the defendant was not of that description. The change in the appearance of the mare was temporary; she was neither branded nor marked, and the' cutting of the mane and tail could not have been intended to-prevent her being identified, as she remained in the owner’s' stable. It can only be regarded as a mischievous trespass, and we cannot bring ourselves to view the perpetrator as having incurred the same penalty as if he had stolen his-neighbour’s cow, or altered the brand of his horse. If to cut off the mane of a horse is to disfigure, the cutting off a goat’s-beard would be the same; and, without intending to treat the' subject with levity, could -we consider the cutting off the' beard of a ram goat, by a mischievous boy, as equal in guilt, and subject to the same penalty, as stealing him? We do not say that the penalty may not be incurred by disfiguring a horse in his owner’s stable, or that the act must be done animo furandi. We will leave the cases to be adjudged as they arise; but are of opinion that the defendant has not committed the offence described in the Act. As the manner of disfiguring is not set forth in the indictment, we can only grant *161 a new trial to enable the defendant to avail himself of this-judgment.. And it is so ordered.
Gantt, Richardson, Evans and Butler, JJ. concurred.
O’Neall, J.
I think there is nothing in the objection to the indictment. The case of The State vs. Cantrell, (2 Hill R. 389,) was for maliciously killing a horse in the night time, which subjects the party to a heavy penalty ; the indictment there followed the words of the Act, and did not set out the manner of the killing : it was held to be sufficient. If that case be law, I am at a loss to conceive why that rule should not govern this. Both indictments are for statutory offences; the former of a much more heinous character than the latter.
If the manner of maliciously killing a horse in the night time need not be set out, it surely cannot be necessary to state the manner in which he was disfigured. But if our own case is not a sufficient guide for us, surely English precedents will be enough to satisfy the most fastidious. Refer' to the forms of indictment under the Black Act, and they will be found to be as general as the forms now before us.
The most serious objection is that which makes the1 question whether the offence made out by the proof be an indictable one. The words of the Act, “ wilfully and knowingly marking, branding or disfiguring,” describe the offences prohibited. Marking, branding and disfiguring are three offen-ces which may be committed under the Act. To make out the offence of disfiguring, it cannot be necessary to shew' facts that would make out the offences of marking or branding. An alteration of natural marks whereby a horse is-known, is, unquestionably, disfiguring. Why? Because his natural appearance is changed. Cut off his tail; and, if it be a part of the flesh, or bone, it is admitted that it would be a disfiguring. When the hair is shaved off, is- it not just as much a disfiguring of the horse, and often more, than cutting off his tail ? To me it seems to be so. The object of the Act was not only to prevent the disguising of horses, cattle,, *162 &c. “by altering tlie flesh marks so as to prevent the owners from knowing them;” but it was, also, to prevent malicious mischief. The disposition to do' that which may vex and harrass another, without any benefit to the person doing the act, is, beyond all doubt, as much to be curbed and restrained by law, as that which aims at higher results of crime. This case is an apt illustration of such a law. No one can doubt that the defendant’s act was one of mere wantonness and malice. Is it to go unpunished, under a law which covers it in wo'rds, and where all the reasons of the enactment would lead us to say that it may be within the intention ? For one, I cannot answer in the affirmative. Let the defendant, and all others in a like way offending, be punished; and the security of the citizen in the enjoyment of his property, will be established by law, and not only by his own right arm, to which he might, otherwise, have to appeal.
The only serious objection to this construction of the Act, is the decision of the Court of Appeals in the case of Gage vs. Shelton. But that decision, rightly understood, would not, I think, stand in our way. That was an action of slander: the words, in one of the counts, were, “last night my horse was docked,” &c. It was held that these words did not impute the offence of disfiguring; “for,” said Mr. Justice Johnson, “ there is nothing in the mere cutting off the hair of a horse’s tail, that is, in itself, so calculated to disfigure that the owner would not know him again ; nor "was there any thing, in the manner of speaking the words, calculated to convey the idea that the defendant imputed that intention to the plaintiff.” To dock a horse is any thing else than disfiguring him. It is done by some horse jockies to improve his appearance. The only meaning of the Court, in the case referred to, is, that such words do not necessarily import the offence of disfiguring. But those words are very different from the charge of shaving off the mane and the hair from the tail. This constitutes a charge of altering the animal as seriously as if the ears or the tail had been cut off. I am. *163 therefore, satisfied that, that case does not stand in our way, and that the words of the Act cover the offence proved. The grounds for new trial require no comment. The report sufficiently explains the propriety of the evidence recorded, and of the verdict found upon it.
Thompson Sf Eaves for the motion.